*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1707**

State of Minnesota,
Respondent,

vs.

Alan David Baum,
Appellant

**Filed January 11, 2016
Affirmed; motion denied
Minge, Judge⃰**

Steele County District Court
File No. 74-CR-12-2693

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Daniel A. McIntosh, Steele County Attorney, Julia A. Forbes, Assistant County Attorney
(for respondent)

Lisa Lodin Peralta, Robins Kaplan LLP, Minneapolis, Minnesota (for appellant)

Considered and decided by Schellhas, Presiding Judge; Reyes, Judge; and Minge,

Judge.

---

⃰ Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to
Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**MINGE**, Judge

Appellant contests his convictions of criminal vehicular operation and third-degree driving while impaired, arguing that the district court erred in denying his motion to suppress the results of a warrantless blood draw. We affirm.

**FACTS**

Respondent State of Minnesota charged appellant Alan David Baum with two counts of criminal vehicular operation and one count of third-degree driving while impaired (DWI) after Baum was involved in an automobile accident in November 2012. Baum moved the district court to suppress evidence of his blood-test results, arguing that the police drew his blood in violation of his "constitutional and statutory rights to be free from unreasonable search and seizure." Baum cited *Missouri v. McNeely*, 133 S. Ct. 1552 (2013), in support of his motion. The district court held an omnibus hearing and heard testimony from Minnesota State Patrol Trooper Shawn Barta. Based on Trooper Barta's testimony, the district court made factual findings.

On November 3, 2012, at approximately 2:29 p.m., Trooper Barta was dispatched to a two-vehicle-crash site in Owatonna. He was informed that the crash resulted in injuries. When Trooper Barta arrived at the scene, officers from the Owatonna Police Department and Steele County Sheriff's Department were already there, along with ambulances and personnel from the fire department. An officer gave Trooper Barta Baum's California driver's license. Trooper Barta was told that Baum was the driver of a white Honda involved in the crash and that he was currently in an ambulance.

Trooper Barta went to an ambulance and spoke with the driver of the other vehicle. The driver told him that he was driving a Ford pickup, traveling at about 77 miles per hour, and saw a white Honda approaching from behind at a high rate of speed. The driver told Trooper Barta that the Honda slid into his pickup, causing both vehicles to spin and roll. Trooper Barta observed significant damage to both vehicles and tire marks and scratches on the pavement. Someone told him that an empty bottle of vodka was found in the white Honda.

Baum was taken to the hospital before Trooper Barta had a chance to talk with him. Trooper Barta went to the hospital and located Baum in a room in the emergency department. As they spoke, Trooper Barta smelled alcohol coming from Baum. Baum denied drinking alcohol. Trooper Barta asked Baum to take a preliminary breath test (PBT), and Baum provided a breath sample that registered an alcohol concentration of 0.222.

Trooper Barta left Baum and found the passenger and driver of the Ford pickup, both of whom had been admitted to the same hospital. He observed that both had injuries from the accident and were wearing neck collars. There was blood on the passenger's head.

Trooper Barta walked to his squad car. He contacted dispatch to provide an update regarding the possible criminal-vehicular-operation offense and to report the PBT result. Trooper Barta took a blood kit from the trunk and returned to Baum's hospital room. Trooper Barta told Baum that based on the strong odor of alcohol and the PBT result, he was going to have blood drawn. Trooper Barta again asked Baum if he had consumed any

3

alcohol.  Baum denied drinking alcohol that day but admitted to drinking the night before.  Baum then said: "Do what you want."  A nurse came in and, at Trooper Barta's request, took a blood sample from Baum.  Trooper Barta testified at the hearing that the blood draw was taken at 3:37 p.m.  The record indicates that testing established an alcohol concentration of 0.24.

The district court concluded that exigent circumstances justified the warrantless blood test and denied Baum's motion to suppress the results of the blood test.  Baum waived his right to a jury trial and stipulated to the state's case to obtain appellate review of the pretrial ruling under Minn. R. Crim. P. 26.01, subd. 4.  The district court found Baum guilty as charged.  The district court sentenced Baum on the first count of criminal vehicular operation to 364 days in jail but stayed 334 days and placed Baum on probation for three years.

Baum appealed the district court's order denying his motion to suppress.  This court stayed Baum's appeal pending a decision by the Minnesota Supreme Court in *State v. Stavish*, 852 N.W.2d 906 (Minn. App. 2014), *review granted* (Minn. Nov. 18, 2014).  The supreme court filed its decision in August 2015.  *State v. Stavish*, 868 N.W.2d 670 (Minn. 2015).  This court dissolved the stay and reinstated the appeal.

**D E C I S I O N**

"When reviewing a district court's pretrial order on a motion to suppress evidence, we review the district court's factual findings under a clearly erroneous standard and the district court's legal determinations de novo."  *State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008) (quotation omitted).

4

The United States and Minnesota Constitutions protect the right of the people to be free from unreasonable searches and seizures. U.S. Const. amend. IV; Minn. Const. art. I, § 10. Taking a blood sample constitutes a "search" under the Fourth Amendment. *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 616-17, 109 S. Ct. 1402, 1412-13 (1989). "Such an invasion of bodily integrity implicates an individual's most personal and deep-rooted expectations of privacy." *McNeely*, 133 S. Ct. at 1558 (quotation omitted). Ordinarily, a warrant is required for any intrusion into the human body. *Id*. A warrantless search is per se unreasonable "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967). In general, evidence obtained in violation of the constitution must be suppressed. *See State v. Jackson*, 742 N.W.2d 163, 177-78 (Minn. 2007) (suppressing evidence obtained during an unconstitutional nighttime search).

"One well-recognized exception . . . applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *McNeely*, 133 S. Ct. at 1558 (*quoting Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011)). Courts look to the totality of the circumstances of each case in order to determine whether a law-enforcement officer faced an emergency that justified acting without a warrant. *Id*. at 1559. A warrant is not required where an officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence." *Schmerber v. California*, 384 U.S. 757, 770, 86 S. Ct. 1826, 1835 (1966) (quotation omitted). But,

5

> [t]he context of blood testing is different in critical respects from other destruction-of-evidence cases in which the police are truly confronted with a "now or never" situation. In contrast to, for example, circumstances in which the suspect has control over easily disposable evidence, BAC evidence from a drunk-driving suspect naturally dissipates over time in a gradual and relatively predictable manner.

*McNeely*, 133 S. Ct. at 1561 (citations and quotation omitted). In *McNeely*, the Supreme Court noted the relative ease with which a warrant may now be obtained, through "telephonic or radio communication, electronic communication such as e-mail, and video conferencing." *Id*. at 1562. Therefore, the Supreme Court concluded that "while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case . . . it does not do so categorically" and "[w]hether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances." *Id*. at 1563.

In *Stavish*, the Minnesota Supreme Court considered whether exigent circumstances justified a warrantless blood draw. 868 N.W.2d at 677. The court stated that the "relevant inquiry" in light of *McNeely* and *Schmerber* is

> whether, under all of the facts reasonably available to the officer at the time of the search, it was objectively reasonable for the officer to conclude that he or she was faced with an emergency, in which the delay necessary to obtain a warrant would significantly undermine the efficacy of the search.

*Id*. at 676-77. In considering the totality of the circumstances, the court noted that law enforcement had reason to believe that Stavish was in an automobile accident after consuming alcohol and that his alcohol consumption contributed to the accident. *Id*. at 677. It was therefore "important to draw Stavish's blood within 2 hours of the accident to

6

ensure the reliability and admissibility of the alcohol concentration evidence." *Id*. at 677-78 (citing Minn. Stat. § 169A.20, subd. 1(5) (2012)). The court further noted Stavish sustained serious injuries that "potentially required that he be transported by helicopter to another hospital . . . render[ing] his future availability for a blood draw uncertain." *Id*. at 678. The court concluded that, under these circumstances, "it was objectively reasonable for [the police officer conducting the blood draw] to conclude that he was faced with an emergency in which the delay necessary to obtain a warrant threatened the destruction of evidence." *Id*.

On the same day that *Stavish* was released, the Minnesota Supreme Court released *State v. Lindquist*, 869 N.W.2d 863 (Minn. Aug. 19, 2015). In *Lindquist*, the court held that "the exclusionary rule does not apply to violations of the Fourth Amendment to the U.S. Constitution, or Article I, Section 10, of the Minnesota Constitution when law enforcement acts in objectively reasonable reliance on binding appellate precedent." *Lindquist*, 869 N.W.2d at 876. In that case, an officer facilitated a warrantless blood draw before *McNeely* was decided. *Id*. at 865. The Minnesota Supreme Court noted that at the time of the blood draw, *State v. Shriner* was binding, which provided that "'[t]he rapid, natural dissipation of alcohol in the blood creates single-factor exigent circumstances that will justify the police taking a warrantless, nonconsensual blood draw from a defendant, provided that the police have probable cause to believe that defendant committed criminal vehicular operation.'" *Id*. at 877-78 (quoting *State v. Shriner*, 751 N.W.2d 538, 545 (Minn. 2008), *abrogated by Missouri v. McNeely*, 133 S. Ct. 1552 (2013)). The Minnesota court further noted that "[w]e later extended the single-factor-exigency analysis from *Shriner* to

any DWI offense." *Id*. at 878 (quoting *State v. Netland*, 762 N.W.2d 202, 213 (Minn. 2009), *abrogated in part by McNeely*, 133 S. Ct. 1552). The supreme court concluded that "the officer who facilitated Lindquist's blood draw acted in good-faith reliance on *Shriner* and *Netland*," and held that "the district court did not err in admitting the results of Lindquist's blood draw because the officer who facilitated the blood draw acted in objectively reasonably reliance on binding appellate precedent." *Id*. at 878-79.

Compared to *Stavish*, this case presents less compelling circumstances for a warrantless blood draw. Unlike *Stavish*, there was nothing on this record to suggest that Baum might become unavailable. No record was made regarding how much time it would take to secure a warrant. Although the incident occurred on a Saturday afternoon, it was not the middle of the night and judges were presumably available. Also no record was made of how much time Trooper Barta had left to draw blood before the two-hour time period expired. *See* Minn. Stat. § 609.21, subd. 1(4) (2012) (stating that a person is guilty of criminal vehicular operation "if the person causes injury to . . . another as a result of operating a motor vehicle . . . while having an alcohol concentration of 0.08 or more, *as measured within two hours of the time of driving*" (emphasis added)).

But we do not decide whether there were exigent circumstances justifying a warrantless blood draw under *Stavish* because *Lindquist*, *Shriner*, and *Netland* were our controlling caselaw at the time Trooper Barta facilitated the blood draw. Trooper Barta's actions were justified by these appellate precedents, which held that the natural dissipation of alcohol in the blood creates a single-factor exigent circumstance.

8

In a motion before this court, Baum asks this court to strike the state's discussion of *Lindquist* from its supplemental brief filed after this appeal was reinstated. Baum argues that the state's discussion of *Lindquist* "should be stricken because it exceeds the scope of what this Court permitted to be addressed upon reinstatement." Baum cites this court's August 25 reinstatement order, which states that the "parties will be given the opportunity to file supplemental briefs addressing *Stavish* and its impact on the issues presented in this appeal."

But Baum acknowledges that the state raised the good-faith exception in district court and briefed it on appeal as an alternative ground to affirm the district court's decision. "A respondent can raise alternative arguments on appeal in defense of the underlying decision when there are sufficient facts in the record for the appellate court to consider the alternative theories, there is legal support for the arguments, and the alternative grounds would not expand the relief previously granted." *State v. Grunig*, 660 N.W.2d 134, 137 (Minn. 2003). And "this court[] is bound by supreme court precedent." *State v. M.L.A.*, 785 N.W.2d 763, 767 (Minn. App. 2010), *review denied* (Minn. Sept. 21, 2010). Because the good-faith exception can be addressed as an alternative argument in defense of the underlying decision, and we are bound by supreme court precedent, we are obligated to follow *Lindquist* regardless of whether the state properly raised it in its supplemental brief.

Baum further requests this court to strike the state's entire good-faith-exception argument from both its brief and supplemental brief on the ground that "the argument is outside the scope of this appeal based on explicit written waiver of the State." Baum argues that as part of the waivers and stipulations the parties agreed upon under Minn. R. Crim.

9

P. 26.01, subd. 4, the state voluntarily limited the scope of the appeal "to one legal question of the constitutionality of the warrantless blood draw," which is distinct from whether or not the exclusionary rule applies. Baum further argues that the state "agreed to the relief of vacation of [his] convictions if he wins on the merits of his constitutional challenge." Baum's argument is not persuasive. The issue for appeal stated on the written waivers and stipulation document signed by the parties is not as narrow as Baum suggests. The document states that "[t]he review on appeal will be of the denial of Defendant Baum's motion to suppress [] the results of a blood test." Application of the good-faith exception is within the scope of review of whether or not the district court erred in denying Baum's motion to suppress the results of the blood test.

Baum does not contest that the good-faith exception would resolve this case if this court applies *Lindquist* because *Shriner* and *Netland* were binding at the time of his blood draw in November 2012. Accordingly, we hold that the district court did not err in admitting the results of Baum's blood draw.

**Affirmed; motion denied.**