# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A22-0079

State of Minnesota,
Respondent,

vs.

Toni Elizabeth Ickler,
Appellant.

**Filed January 29, 2024**
**Reversed**
**Johnson, Judge**

Olmsted County District Court
File No. 55-CR-20-6304

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mark A. Ostrem, Olmsted County Attorney, James E. Haase, Senior Assistant County Attorney, Rochester, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Adam Lozeau, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Larkin, Presiding Judge; Johnson, Judge; and Frisch, Judge.

## SYLLABUS

The evidence is insufficient to prove that appellant violated a harassment restraining order because the temporary *ex parte* harassment restraining order that was served on appellant was not in effect nine days after the hearing on the harassment petition and because the state did not introduce any evidence that another harassment restraining order was issued at or after that hearing.

**OPINION**

**JOHNSON**, Judge

An Olmsted County jury found Toni Elizabeth Ickler guilty of the offense of stalking. The state argued to the jury that Ickler violated a temporary *ex parte* harassment restraining order three times by placing three calls to the protected person's cell phone and leaving three voice-mail messages. But the temporary *ex parte* harassment restraining order had expired nine days before the calls and messages on which Ickler's stalking conviction is based and there is no evidence of any other harassment restraining order. Therefore, we reverse the conviction.

**FACTS**

Ickler and C.J. were partners in a romantic relationship for approximately two and one-half years until March 2020, when the relationship ended in a contentious manner.

C.J. petitioned the Olmsted County District Court for a harassment restraining order and named Ickler as the respondent. On April 30, 2020, a referee issued a temporary harassment restraining order captioned "Ex Parte Order Granting Petition for Harassment Restraining Order." The order prohibited Ickler from, among other things, contacting C.J. The order warned that a violation of the order may be a criminal offense. The order also stated: "This restraining order is in effect until April 30, 2022 unless changed by a later court order. Respondent can ask the court to change or vacate the restraining order by filing a request for hearing within 20 days of the date of service of the petition."

A Sherburne County deputy sheriff served the temporary *ex parte* harassment restraining order on Ickler on May 4, 2020. Ickler requested a hearing on C.J.'s petition

2

on May 18, 2020.  The district court held a hearing on August 19, 2020.  There is no evidence in the record that the district court issued a harassment restraining order on or after August 19, 2020.

On August 28, 2020, C.J. told a Rochester police officer that Ickler had violated a harassment restraining order by calling her cell phone three times and leaving three voice-mail messages.  In October 2020, the state charged Ickler with one count of felony stalking, in violation of Minn. Stat. § 609.749, subd. 5(a) (2020), and three counts of misdemeanor violations of a harassment restraining order, in violation of Minn. Stat. § 609.748, subd. 6(b) (2020).

The case was tried to a jury on two days in June 2021.  At a pre-trial conference on the first day of trial, the district court asked the prosecutor to clarify whether the state was relying on the April 2020 temporary *ex parte* harassment restraining order or on some other harassment restraining order.  The prosecutor responded:  "I don't think another order was issued.  I think they had a hearing on the HRO, and the HRO that was served back in May was the HRO that continues to this day."

The state called four witnesses in its case-in-chief, including C.J. and the investigating police officer.  The state also introduced and played for the jury audio-recordings of the three voice-mail messages that were left on C.J.'s cell phone at 1:37 p.m., 1:38 p.m., and 1:40 p.m. on August 28, 2020.  C.J. testified that she recognized Ickler's voice on the voice-mail messages.  Ickler did not testify.

The jury found Ickler guilty of all four charges.  At sentencing, the district court imposed a sentence on the stalking offense by ordering a downward durational departure

from the presumptive guidelines sentence and by imposing a sentence of 90 days in jail, with 88 days stayed, and one year of probation. The district court did not adjudicate counts 2, 3, and 4, which are the underlying misdemeanor violations, on the ground that they are lesser-included offenses.

Ickler appeals. She makes three arguments for reversal. First, she argues that the evidence is insufficient to support her stalking conviction because the state did not prove that a harassment restraining order was in effect at the time of the alleged offense. Second, she argues, in the alternative, that her trial attorney provided her with ineffective assistance of counsel. Third, she argues, again in the alternative, that the district court plainly erred by admitting inadmissible hearsay evidence. In light of our resolution of Ickler's first argument, we need not consider her alternative arguments.

## ISSUE

Is the evidence sufficient to prove that a harassment restraining order was in effect when Ickler contacted C.J.?

## ANALYSIS

Ickler argues that the state's evidence is insufficient to support her conviction of stalking. Specifically, Ickler argues that the state did not prove that she violated a harassment restraining order because the state did not prove that a harassment restraining order was in effect at the time of the three alleged violations. Ickler asserts that the April 2020 temporary *ex parte* harassment restraining order was, as a matter of law, in effect only until August 19, 2020, when a hearing was held on C.J.'s petition, but was not in effect after that hearing.

4

In analyzing an argument that the evidence is insufficient to support a conviction, this court undertakes "a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient." *State v. Jones*, 977 N.W.2d 177, 187 (Minn. 2022) (quotation omitted). We "carefully examine the record to determine whether the facts and the legitimate inferences drawn from them would permit the factfinder to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted." *State v. Waiters*, 929 N.W.2d 895, 900 (Minn. 2019) (quotation omitted). "We assume that the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Friese*, 959 N.W.2d 205, 214 (Minn. 2021) (quotation omitted).

The above-described standard of review applies so long as a conviction is adequately supported by direct evidence. *State v. Horst*, 880 N.W.2d 24, 39 (Minn. 2016). Direct evidence is "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *State v. Harris*, 895 N.W.2d 592, 599 (Minn. 2017) (alteration in original) (quotation omitted). Circumstantial evidence, on the other hand, is "evidence from which the factfinder can infer whether the facts in dispute existed or did not exist." *Id.* (quotation omitted).

If a conviction depends on circumstantial evidence, we apply a heightened standard of review with a two-step analysis. *State v. Moore*, 846 N.W.2d 83, 88 (Minn. 2014). "The first step is to identify the circumstances proved." *Id.* "In identifying the circumstances proved, we assume that the jury resolved any factual disputes in a manner that is consistent with the . . . verdict." *Id.* The second step is to "examine independently the reasonableness

5

of [the] inferences that might be drawn from the circumstances proved" and "determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Id.* (alteration in original) (quotations omitted). At the second step, we do not give deference to the jury's verdict. *Loving v. State*, 891 N.W.2d 638, 643 (Minn. 2017).

## A.

Before analyzing Ickler's sufficiency-of-the-evidence argument, we must, as a preliminary manner, consider the state's contention that, for two reasons, we should not consider her argument for reversal.

First, the state contends that Ickler's sufficiency-of-the-evidence argument is an impermissible collateral attack on the temporary *ex parte* harassment restraining order. The state cites *State v. Ness*, 819 N.W.2d 219 (Minn. App. 2012), *aff'd*, 834 N.W.2d 177 (Minn. 2013), in which we stated generally that "a party's failure to appeal the issuance of a court order precludes a collateral attack on that order in a subsequent proceeding." *Id.* at 223 (quotation omitted). Our *Ness* opinion cites *State v. Harrington*, 504 N.W.2d 500 (Minn. App. 1993), *rev. denied* (Minn. Sept. 30, 1993), in which two appellants convicted of violating a harassment restraining order were precluded from challenging the order's validity on direct appeal from their convictions because they had not challenged the order's validity in an appeal from its issuance. *Id.* at 502-03.

The collateral-attack principle described in *Ness* and *Harrington* does not apply to Ickler because she does not argue that the April 2020 temporary *ex parte* harassment restraining order was invalid when it was issued; she argues merely that it expired on

6

August 19, 2020, when a hearing was held on C.J.'s harassment petition.  In addition, Ickler cannot be faulted for not appealing from the issuance of the April 2020 temporary *ex parte* harassment restraining order because that order was not appealable.  *See Fiduciary Found., LLC ex rel. Rothfusz v. Brown*, 834 N.W.2d 756, 760-61 (Minn. App. 2013) (citing *Chapman v. Dorsey*, 41 N.W.2d 438, 443 (Minn. 1950)).  This case is similar to *Ness*, in which we concluded that the appellant could challenge the constitutionality of a domestic-abuse no-contact order on direct appeal from his conviction because the order was not appealable when it was issued.  819 N.W.2d at 224.  Thus, Ickler's argument is not an impermissible collateral attack.

Second, the state contends that Ickler forfeited her argument that the April 2020 temporary *ex parte* harassment restraining order was not in effect on August 28, 2020, because she did not make that argument at trial.  The caselaw is clear, however, that Ickler's sufficiency-of-the-evidence argument is not forfeited.  *See State v. Pakhnyuk*, 926 N.W.2d 914, 918-19 (Minn. 2019).  That is so because due process requires the state to prove a defendant's guilt beyond a reasonable doubt and because a sufficiency-of-the-evidence argument is "essentially the same argument" that a defendant makes at trial by requiring the state to satisfy its burden of proof.  *See id.*

Thus, Ickler is not precluded from arguing that the evidence is insufficient on the ground that the April 2020 temporary *ex parte* harassment restraining order was not in effect on August 28, 2020.

7

## B.

A person commits the offense of stalking if she commits "two or more acts within a five-year period that violate or attempt to violate the provisions of" one of several criminal statutes enumerated in the stalking statute, she "knows or has reason to know" that those acts "would cause the victim under the circumstances to feel terrorized or to fear bodily harm," and her acts "cause this reaction on the part of the victim." Minn. Stat. § 609.749, subd. 5(a), (b).

Among the several criminal statutes enumerated in the stalking statute is the statute making it a crime to violate a harassment restraining order. *Id.*, subd. 5(b)(7) (referencing Minn. Stat. § 609.748, subd. 6). To prove that a person committed the crime of violating a harassment restraining order, the state must prove that the person knew of the order and violated it. Minn. Stat. § 609.748, subd. 6(b); *State v. Andersen*, 946 N.W.2d 627, 632 (Minn. App. 2020). A person may commit the crime of violating a harassment restraining order only if the harassment restraining order is in effect when the person is alleged to have violated it. *See* Minn. Stat. § 609.748, subd. 6(b).

To determine whether a harassment restraining order was in effect at the time of an alleged violation, it is useful to review the statute governing harassment restraining orders. "A person who is a victim of harassment . . . may seek a restraining order from the district court . . . ." Minn. Stat. § 609.748, subd. 2(a). In this context, the term "harassment" is defined to include, among other things, "repeated incidents of intrusive or unwanted acts, words, or gestures that have a substantial adverse effect or are intended to have a substantial

8

adverse effect on the safety, security, or privacy of another." *Id.*, subd. 1(a)(1); *see also* *Peterson v. Johnson*, 755 N.W.2d 758, 762 (Minn. App. 2008).

Upon the filing of a petition for a harassment restraining order, a district court shall order a hearing if the petitioner requests a hearing. Minn. Stat. § 609.748, subd. 3(a). In addition, a district court "may issue a temporary restraining order" to order the respondent to cease or avoid harassment or not contact the petitioner "if the court finds reasonable grounds to believe that the respondent has engaged in harassment." *Id.*, subd. 4(a), (b). The district court need not give notice to the respondent before issuing a temporary harassment restraining order. *Id.*, subd. 4(c). But a copy of the temporary harassment restraining order must be served on the respondent after it is issued, along with the petition and the order for a hearing, if the petitioner has requested a hearing. *Id.* If a temporary restraining order has been issued but the petitioner has not requested a hearing, the respondent may request a hearing. *Id.*, subd. 4(e).

"When signed by a referee, the temporary order becomes effective upon the referee's signature." *Id.*, subd. 4(b). "The temporary restraining order is in effect until a hearing is held on the issuance of a restraining order under subdivision 5." *Id.*, subd. 4(d).

**C.**

In this case, the state sought to prove that Ickler committed three violations of a harassment restraining order by contacting C.J. by telephone three times on August 28, 2020. To prove the existence of a harassment restraining order on August 28, 2020, the state introduced into evidence, as exhibit 1, a copy of the April 2020 temporary *ex parte* harassment restraining order. The state also introduced into evidence, as exhibit 2, the

9

register of actions[1] in the civil case in which the temporary *ex parte* harassment restraining order was issued. The register of actions refers to C.J.'s petition, the temporary *ex parte* harassment restraining order, a request for a hearing, a notice of hearing, and the occurrence of a hearing on August 19, 2020. The register of actions does not refer to any harassment restraining order issued on or after August 19, 2020.

Three of the state's witnesses testified about the existence of a harassment restraining order. C.J. testified that she petitioned for a restraining order in early 2020, shortly after the onset of the COVID-19 pandemic. She testified that she obtained an order that became effective in April 2020, that the order remained in effect at the time of trial, and that it had been continuously in effect. A Sherburne County deputy sheriff testified that he served the temporary *ex parte* harassment restraining order on Ickler in Sherburne County on May 4, 2020, by personally delivering it to her. The police investigator also testified about C.J.'s report that Ickler had violated a harassment restraining order on August 28, 2020. The investigator also testified that he verified the existence of a harassment restraining order that had been served on Ickler in Sherburne County.

**1.**

Ickler argues that the above-described evidence does not prove that she violated a temporary harassment restraining order on August 28, 2020, because the April 2020 temporary *ex parte* harassment restraining order had expired on August 19, 2020, when a

---

[1]A register of actions, which is prepared and maintained by the district court administrator, is a list of the documents filed and events occurring in a pending court case. *See* Minn. Stat. § 485.07(1) (2020).

hearing was held on C.J.'s petition. She relies on the statutory provision stating that a temporary restraining order "is in effect until a hearing is held on the issuance of a restraining order under subdivision 5." Minn. Stat. § 609.748, subd. 4(d). In response, the state argues that section 609.748, subdivision 4(d), provides merely that a temporary harassment restraining order is in effect *before* a hearing is held on a harassment petition but does *not* provide that a temporary harassment restraining order is *not* in effect *after* such a hearing.

The parties' arguments require us to interpret the statute. The first step in interpreting the statute "is to determine whether the statute's language, on its face, is ambiguous." *State v. Thonesavanh*, 904 N.W.2d 432, 435 (Minn. 2017). "'A statute is ambiguous only if it is subject to more than one reasonable interpretation.'" *Id.* at 435 (quoting *500, LLC v. City of Minneapolis*, 837 N.W.2d 287, 290 (Minn. 2013)). To determine whether the statute is ambiguous or unambiguous, we look to "the common and ordinary meanings" of the words used. *Id.* at 436. If we conclude that a statute is unambiguous, "then we must apply the statute's plain meaning." *State v. Nelson*, 842 N.W.2d 433, 436 (Minn. 2014) (quotation omitted).

To interpret section 609.748, subdivision 4(d), it is appropriate to "look to dictionary definitions to determine the common and ordinary meanings of" a word used in the statute. *Thonesavanh*, 904 N.W.2d at 436. In this case, the key word is "until." Well-respected dictionaries describe the first or primary meaning of the word "until" as "up to the time of," *The American Heritage Dictionary of the English Language* 1901 (5th ed. 2018); "up to the time that or when," *The Random House Dictionary of the English Language* 2089

11

(2d ed. 1987); and "up to the time that or when" or "till such time as," *Webster's New International Dictionary* 2795 (2d ed. 1946); *see also Muscarello v. United States*, 524 U.S. 125, 128 (1998) (treating dictionary's first definition of word as primary); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 163 (2012) (noting order of definitions). The primary meaning of "until" supports Ickler's interpretation of subdivision 4(d) by indicating that something that exists "until" an event exists only "up to the time of" the event and does *not* exist after the event.

It also is appropriate to consider nearby statutory provisions. *See, e.g.*, *STRIB IV, LLC v. County of Hennepin*, 886 N.W.2d 821, 825 (Minn. 2016); *State v. Schmid*, 859 N.W.2d 816, 822-24 (Minn. 2015); *Nelson v. Schlener*, 859 N.W.2d 288, 293 (Minn. 2015); *American Family Ins. Group v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000). In doing so, we "'construe a statute as a whole and interpret its language to give effect to all of its provisions.'" *State v. Prigge*, 907 N.W.2d 635, 638 (Minn. 2018) (quoting *State v. Riggs*, 865 N.W.2d 679, 683 (Minn. 2015)). In this case, a different subdivision of the same section specifies when a temporary harassment restraining order begins to take effect: "When signed by a referee, the temporary order becomes effective upon the referee's signature." Minn. Stat. § 609.748, subd. 4(b). In light of subdivision 4(b), it is apparent that subdivision 4(d) specifies when a temporary harassment restraining order ceases to be in effect.

In addition, it is appropriate to consider the context of subdivision 4(d). The purpose of a hearing on a harassment petition is to determine whether a petitioner is entitled to a harassment restraining order. If such a hearing is held, a harassment restraining order may

be granted only if the petitioner establishes "that there are reasonable grounds to believe that the respondent has engaged in harassment." Minn. Stat. § 609.748, subd. 5(b)(3). But if a hearing is held and a petitioner does not establish reasonable grounds to believe that the respondent has engaged in harassment, there is no logical reason why a temporary harassment restraining order should remain in effect. *See id.* Furthermore, this court has relied on subdivision 4(d) in stating that, if a hearing is not held pursuant to subdivision 5, a temporary harassment restraining order "becomes" a harassment restraining order and "remains in effect for the period set forth in" the temporary order. *Fiduciary Found.*, 834 N.W.2d at 760. That statement implies that, if a hearing *is* held, a temporary harassment restraining order does *not* remain in effect.

In light of its text, structure, and context, we interpret section 609.748, subdivision 4(d), to provide unambiguously that a temporary harassment restraining order is in effect before a hearing on a harassment petition but is not in effect after such a hearing.[2] Thus, in this case, the April 2020 temporary *ex parte* harassment restraining order was in effect up to the time of the August 19, 2020 hearing on C.J.'s harassment petition but was not in effect on August 28, 2020, when Ickler contacted C.J. three times.

---

[2]We emphasize that the state did not introduce any evidence that the district court renewed or extended the temporary harassment restraining order or issued another temporary harassment restraining order at or after the August 19, 2020 hearing. Accordingly, we are not asked to decide whether evidence of such a renewal, extension, or other order would be sufficient to prove that Ickler was prohibited from contacting C.J.

**2.**

The state makes an additional, fact-based argument that is independent of its statutory-interpretation argument. Specifically, the state urges the court to consider exhibit 1, exhibit 2, C.J.'s testimony, and the police investigator's testimony "in the light most favorable to the jury verdict" and to conclude that the evidence "is sufficient to support a finding that the HRO was effective when Ickler had contact with C.J. on August 28, 2020."

To the extent that the state asks the court to conclude that the April 2020 temporary *ex parte* harassment restraining order was in effect on August 28, 2020, because the state's lay witnesses said so, we cannot agree. As stated above, the April 2020 temporary *ex parte* harassment restraining order was—as a matter of law—not in effect after the August 19, 2020 hearing on C.J.'s harassment petition.

To the extent that the state asks the court to conclude that some other harassment restraining order was in effect on August 28, 2020, we again cannot agree. The state did not introduce any evidence of a harassment restraining order other than the April 2020 temporary *ex parte* harassment restraining order.[3] In the absence of direct evidence of such

---

[3]We note that the state has urged the court to review a transcript of the August 19, 2020 hearing in the civil harassment proceeding. During the period for appellate briefing, the state moved to supplement the record with a copy of that transcript. But the transcript was not introduced into evidence at Ickler's criminal trial. Accordingly, this court denied the state's motion to supplement the record. Undaunted, the state quoted the transcript in its responsive brief. Ickler then moved to strike the portions of the state's brief that cited or relied on the transcript of the August 19, 2020 hearing. This court granted Ickler's motion to strike. Thereafter, court staff implemented the court's order by redacting the stricken portions of the state's brief. Accordingly, we have not read the stricken portions of the state's brief and have not reviewed the transcript of the August 19, 2020 hearing.

an order, the state's argument must be considered according to the circumstantial-evidence standard of review. *See Moore*, 846 N.W.2d at 88.

C.J. testified about a harassment restraining order that took effect in April 2020. A Sherburne County deputy sheriff testified that he served a harassment restraining order on Ickler on May 4, 2020, only four days after the April 30, 2020 temporary *ex parte* harassment restraining order was issued. It is apparent that both C.J. and the investigator were referring to the April 2020 temporary *ex parte* harassment restraining order. In addition, the register of actions in C.J.'s harassment case does not indicate that any harassment restraining order was issued after the August 19, 2020 hearing. The circumstantial evidence does not allow for a reasonable inference that an unidentified harassment restraining order was in effect on August 28, 2020. Thus, the circumstantial evidence is *not* "inconsistent with any rational hypothesis except that of guilt." *See id.* (quotation omitted).

In sum, the evidence is insufficient to prove that, on August 28, 2020, a harassment restraining order was in effect that prohibited Ickler from contacting C.J. Accordingly, the evidence is insufficient to prove that Ickler committed the offense of stalking.

## DECISION

The evidence introduced at trial is insufficient to support Ickler's conviction of stalking. Therefore, we reverse Ickler's conviction of that offense.

The jury also found Ickler guilty of three misdemeanor charges of violating a harassment restraining order, but the district court did not enter convictions on those offenses because they are lesser-included offenses. In the absence of a conviction, a

15

defendant does not have a right to appellate review of a guilty verdict. *See* Minn. R. Crim. P. 28.02, subd. 2(1); *State v. Hoelzel*, 639 N.W.2d 605, 609 (Minn. 2002); *State v. Ashland*, 287 N.W.2d 649, 650 (Minn. 1979). Consequently, this opinion is limited to Ickler's conviction of stalking. *See* Minn. Stat. § 609.04, subd. 1 (2020); *State v. Pflepsen*, 590 N.W.2d 759, 767 (Minn. 1999). Nonetheless, it should be clear that the evidence is insufficient to support the guilty verdicts on the misdemeanor offenses for the same reasons that the evidence is insufficient to support the conviction of stalking.

**Reversed.**